UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

LEROY SECHEREST, DAMION LEVY,
TYQWON WALDEN, MARCUS YOUNG,
ARKICA STEWART, COMECHIA RANDLE,
MINNIE STEWART,
QUARNEESHIA WALDEN, DORNELL
MALONE, JOHN ADAMS, DWAYNE
STEWART, YOLANDA WALLACE, CRYSTAL
WALLACE, LEON LEWIS, FREDERICK
JOHNSON, LEONTAY ELLINGTON AND
JAMES BANKHEAD, JR.                                    PLAINTIFFS

VS.                      CIVIL ACTION NO.: 3:24-cv-34-TSL-MTP

CITY OF LEXINGTON, ROBIN MCRORY,
CHARLES HENDERSON, AARON AGEE,
SAM DOBBINS, CORDARIUS EPPS,
CHRIS BURRELL, JUSTIN NEWELL,
LARON SIMPSON AND SCOTT WALTERS                       DEFENDANTS

<u>MEMORANDUM OPINION AND ORDER</u>

This cause is before the court on the motion of defendant
Robin McCrory, Mayor of the City of Lexington, for judgment on the
pleadings pursuant to Rule 12(c) of the Federal Rules of Civil
Procedure.  Plaintiffs have responded to the motion and the court,
having considered the memoranda of authorities submitted by the
parties, concludes the motion should be granted.

Seventeen plaintiffs brought this action against the City of
Lexington, Mayor Robin McCrory, Lexington's current and former
chiefs of police and several officers with the Lexington Police
Department (LPD), with each plaintiff asserting a claim or claims

1

under 42 U.S.C. § 1983 for alleged violation of his or her rights under the Fourth, Fourteenth and/or First Amendments.[1]  The court has since dismissed the claims of five plaintiffs.  See Secherest v. City of Lexington, Civ. Action No. 3:24-cv-34-TSL-MTP, slip op. at pp. 39-40 (S.D. Miss. March 18, 2025).  In addition to suing the officers involved in the specific incidents that are the subject of the complaint, plaintiffs have sued the City, asserting Monell liability, and they have also sued Mayor Robin McCrory in her individual and official capacities.  By her motion, McCrory seeks dismissal of plaintiffs' official and individual capacity claims against her.

The purpose of Rule 12(c) is to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts.  Great Plains Trust. Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 312 (5th Cir. 2002).  The standard for deciding a motion under Rule 12(c) is the same as the

_____

[1]    The court does not set out the factual allegations by plaintiffs as they are numerous and it would serve no useful purpose here.  It is sufficient for present purposes to say that twelve remaining plaintiffs have alleged a claim or claims of false arrest; eight have asserted excessive force claims relating to one or more incidents; and two have alleged that their First Amendment right to freedom of speech was violated on one or more occasions.

2

one for deciding a motion to dismiss under Rule 12(b)(6), namely, whether the plaintiffs have pled "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).  To satisfy this standard, "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. at 555, 127 S. Ct. 1955.  In evaluating whether plaintiffs have stated a claim, the court must accept all plaintiffs' well-pleaded facts as true and view them in the light most favorable to the plaintiffs.  Id. at 570, 127 S. Ct. 1955.

A government official's performance of official duties "creates two potential liabilities:  individual-capacity liability for the person and official-capacity liability for the municipality." Young v. Akal, 985 F. Supp. 2d 785, 795 (W.D. La. 2013) (citing Turner v. Houma Mun. Fire and Police Civil Serv. Bd., 229 F.3d 478, 484 (5th Cir. 2000)).  A suit against a government official in her official capacity is just another way of suing the governmental entity.  So, where, as here, the entity is also a defendant, the official-capacity claim is duplicative and may be dismissed.  See Castro Romero v. Becken, 256 F.3d 349,

355 (5th Cir. 2001) (affirming dismissal of official-capacity claims against individual defendants where such claims "duplicate[d] claims against the respective governmental entities themselves").

Individual-capacity claims seek to hold the government official personally liable for money damages. There is no respondeat superior liability under § 1983. Monell v. Dep't of Social Servs., 436 U.S. 658, 691 (1978); Williams v. Luna, 909 F.2d 121, 123 (5th Cir. 1990). So a plaintiff who alleges nothing more than that a defendant official has supervisory authority and should be responsible in her individual capacity for the actions and omissions of her subordinates, fails to state a viable individual-capacity claim. See Brown v. Davis, 2019 WL 7881607, at *4 (E.D. Tex. Nov. 26, 2019). However, a government official can incur personal liability if she was personally involved in the constitutional deprivation, or there is a sufficient causal connection between her wrongful conduct and the constitutional violation. See Gates v. Texas Dep't of Protective & Regul. Servs., 537 F.3d 404, 435 (5th Cir. 2008) (supervisory official "may be held liable under § 1983 only if (1) he affirmatively participates in the acts that cause the constitutional

4

deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury.").

A government official sued in her individual capacity for money damages may assert a defense of qualified immunity, and in fact, McCrory argues in her motion, inter alia, that plaintiffs' claims must be dismissed based on her qualified immunity.  The qualified immunity doctrine protects officials from civil liability "so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  City of Tahlequah, Oklahoma v. Bond, 595 U.S. 9, 12, 142 S. Ct. 9, 211 L. Ed. 2d 170 (2021) (quoting Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Id. (quotation marks omitted).

"Once the defense of qualified immunity has been raised, the plaintiff has the burden of demonstrating that '(1) the official violated a statutory or constitutional right, and (2) the right was "clearly established" at the time.'"  McClelland v. Katy Indep. Sch. Dist., 63 F.4th 996, 1005 (5th Cir. 2023) (quoting Benfield v. Magee, 945 F.3d 333, 337 (5th Cir. 2019)}.  "A clearly established right is one that is 'sufficiently clear that every

reasonable official would have understood that what he is doing violates that right.'" <u>Mullenix v. Luna</u>, 577 U.S. 7, 11–12, 136 S. Ct. 305, 193 L. Ed. 2d 255 (2015) (quoting <u>Reichle v. Howards</u>, 566 U.S. 658, 663, 132 S. Ct. 2088, 182 L. Ed. 2d 985 (2012)). "To show that a right is 'clearly established,' [plaintiffs] must show: (1) that 'existing precedent ... place[s] the ... question beyond debate' or (2) that the violation is 'obvious' under <u>Tennessee v. Garner</u>, 471 U.S. 1, 105 S. Ct. 1694 (1985), and <u>Graham v. Connor</u>, 490 U.S. 386, 109 S. Ct. 1865 (1989)." <u>Woods v. Harris Cnty., Texas</u>, No. 22-20482, 2024 WL 1174185, at *3 (5th Cir. Mar. 19, 2024).

Plaintiffs in this case do not allege that McCrory was personally involved in any of the constitutional violations they have alleged.  Instead, they allege that she is personally liable because she (1) hired Dobbins and Henderson as police chiefs, despite their respective histories of abusive policing; (2) failed to supervise or address abusive practices by Dobbins and Henderson and those under their command and (3) failed to ensure that police officers were adequately trained.

<u>Hiring/Promoting</u>

"'[D]eliberate indifference' to the 'known or obvious consequences' of a hiring decision can amount to a constitutional

6

violation on the part of the decision maker." <u>Gros v. City of Grand Prairie</u>, 209 F.3d 431, 433–34 (5th Cir. 2000) (quoting <u>Bd. of Cnty. Comm'rs v. Brown</u>, 520 U.S. 397, 407, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)). "'[D]eliberate indifference' exists where adequate scrutiny of an applicant's background would lead a reasonable supervisor to conclude that the plainly obvious consequences of the decision to hire would be the deprivation of a third party's constitutional rights." <u>Id.</u> (citing <u>Snyder v. Trepagnier</u>, 142 F.3d 791, 797 (5th Cir. 1998), <u>cert. granted</u>, 525 U.S. 1098, 119 S. Ct. 863, 142 L. Ed. 2d 716, and <u>cert. dismissed</u>, 526 U.S. 1083, 119 S. Ct. 1493, 143 L. Ed. 2d 575 (1999)).

While plaintiffs allege that "Defendants McCrory and City of Lexington hired two police chiefs, Defendants Sam Dobbins and Charles Henderson, who had a history of racist and abusive policing," plaintiffs od not take care to distinguish between the mayor and the City; but the distinction between them and their respective roles and responsibilities, is important and cannot be disregarded.

The City of Lexington is a code charter municipality, operating under what is commonly referred to as the mayor-aldermen form (also known as the weak mayor form) of government, as provided by Miss. Code Ann. § 21-3-1 *et seq*. <u>See</u> <u>Rule</u>, No. 2005-

7

0156, 2005 WL 1220426, *1 (Miss. A.G. Apr. 8, 2005).  Under this form of government, the "sole authority" to hire and fire employees is vested with the board of aldermen, subject only to the mayor's veto power.  <u>Jones</u>, No. 2010-00113, 2010 WL 1556693, *1 (Miss. A.G. Mar. 26, 2010); <u>Scott v. Stater</u>, 707 So. 2d 182, 184 (Miss. 1997) ("code charter designates authority to the board of aldermen to appoint officers of the municipality while the mayor votes when the board is equally split and can veto the appointment" (citing Miss. Code Ann. § 21-3-15(2)).  Moreover, "[t]he mayor in a code charter may not be delegated the authority to [hire]," as that authority "rests entirely with the board of aldermen."  <u>Cf. Amy Lassitter St. Pe', Esq.</u>, No. 2014-00011, 2014 WL 581516, at *2 (Miss. A.G. Jan. 31, 2014) (in code charter, board cannot delegate employee suspension decision as board has sole authority).

Dobbins was first hired as a police officer by the City of Lexington, through the board of aldermen, in August 2020.  Plaintiffs allege that the City failed to adequately screen Dobbins before hiring him, and had it done so, it would have learned that he "had already been terminated from one law enforcement agency for cause and had a history of racially discriminatory and abusive policing."  Specifically, they allege

that while employed by the Yazoo City Police Department, where he worked from 2005 until his resignation in 2010, Dobbins was written up for "a lot of stuff," some of which was racial.[2] While employed at the Humphreys County Sheriff's Office, where he next worked until he was terminated in September 2013, Dobbins allegedly "continued his discriminatory and abusive police practices, for which he and Humphreys County were repeatedly sued."[3]  Again, it was the City, through the Board, not the mayor, that hired Dobbins in 2020, and there is no allegation that the mayor had any input or direct involvement in that decision.[4]

---

[2]    They add that according to a Yazoo Sheriff's Department employee, "Black law enforcement officers in the county would complain that Dobbins would refer to them as "boy" and "n***r."

[3]    The complaint describes three such lawsuits, including a 2013 lawsuit by a black woman who alleged that Dobbins made sexually inappropriate and racist remarks regarding her mixed-race baby; a 2012 lawsuit by a black man who alleged that Dobbins falsely arrested him for burglary and while he was jailed, segregated him from the rest of the population and denied him clothing or bed linens while keeping the temperature low; and a March 2013 lawsuit by a black man who alleged Dobbins repeatedly stopped and detained him without cause, falsely arrested him during a traffic stop and nearly beat him to death while he was in jail.  All three cases were settled in 2013 for undisclosed amounts.

[4]    The complaint does state that "[t]he process that Defendants McCrory and the City used to screen and hire Defendants Dobbins and Henderson, nevertheless, failed to consider publicly accessible records as well as records from the Mississippi Department of Public Safety, which would have informed them of Defendants' troubling past."  Even if this statement could fairly be read as alleging that McCrory had an independent obligation to investigate the background of police officers hired by the Board, the court is convinced that no such obligation exists.  At the

Plaintiffs do allege that McCrory had a role in the selection of Dobbins as police chief.  Specifically, they allege "[u]pon information and belief, [that in July 2021,] Defendant McCrory and the City terminated then-chief Newton in order to replace him with Defendant Dobbins, despite Defendant Dobbins' checkered history." And according to the complaint, "One former officer recalled Defendant McCrory calling for a Board of Alderman meeting during which she 'begged' the board to support her in hiring Defendant Dobbins as chief."

It bears repeating that the mayor had no authority to hire Dobbins as chief.  And plaintiffs have offered no authority which even suggests, much less demonstrates that it was clearly established that McCrory could be personally liable for advocating to the Board that Dobbins be hired as chief.  Thus, McCrory has qualified immunity for her role in the selection of Dobbins as police chief.

The court would observe, moreover, that there is nothing in the complaint to show that when she recommended Dobbins for the position, McCrory knew or had reason to know of his alleged

---

very least, it is certainly not obvious that such an obligation exists and plaintiffs have pointed to no binding authority holding that there is such an obligation.  Thus, McCrory would have qualified immunity relating to this claim.

history of abusive policing.  While the mayor could have looked into Dobbins' prior employment when he was initially hired as a police officer, plaintiffs have not alleged or offered any authority holding that she (as opposed to the Board) had an independent obligation to do so.[5]  And plaintiffs have not alleged that she became aware of any misconduct by Dobbins during his ten-month tenure as an LPD officer that should have disqualified him from holding the position of police chief.[6]  In fact, plaintiffs specifically allege that "[i]n early July 2021, the same month Defendant Dobbins became chief, Black Lexingtonians began filing official complaints with Defendants McCrory and the City against the Lexington Police Department for false arrest, excessive force, discrimination, retaliation, targeting, harassment, and threats of violence."  They further point to testimony by Holmes County Sheriff Willie March that there was a "a sudden increase in

---

[5]    The question whether the Board failed in its alleged obligation to adequately vet Dobbins before hiring him as a police officer is not before the court on the present motion.  The present motion relates solely to Mayor McCrory's potential liability.

[6]    While three of the plaintiffs herein are suing over incidents involving Dobbins that occurred prior to his being elevated to the position of chief and plaintiffs have identified a fourth incident involving Dobbins' encounter as a police officer with a citizen in which he used excessive force, there is no allegation that the mayor was or should have been aware of any of these incidents when she recommended Dobbins as chief.

complaints that he received from Lexington residents about LPD that accompanied a sudden shift in culture when Defendants McCrory and Lexington promoted Dobbins to chief." In short, plaintiffs have no facts or law that would support holding the mayor personally liable for having recommended that the Board hire Dobbins as Lexington's chief of police.

Henderson, who was first hired as a Lexington police officer in 2013, was selected as police chief after the City fired Dobbins in July 2022.[7] Again, while plaintiffs allege that "McCrory and the City ... hired two police chiefs, Defendants Sam Dobbins and Charles Henderson," the Board, not McCrory, hired Henderson, both initially as a police officer and later, as police chief. And unlike with Dobbins, there is no allegation that she had an active role in the decision to hire him as police chief. The most she did was to not veto his selection. For this, she has qualified immunity, as plaintiffs have not pointed to a single authoritative case holding that a public official can incur personal liability by failing to veto the hiring authority's hiring decision.

---

[7]     Dobbins was fired in July 2022 after the Mississippi Center for Investigative Reporting reported on an audio recording of Dobbins, secretly recorded by an LPD officer, in which Dobbins, among other things, used racial slurs, bragged about shooting a man 109 times in the line of duty, and told the officer, "I don't give a f**k if you kill a m*therf**ker in cold blood ...."

<u>Failure to Supervise/Train</u>

Plaintiffs allege that Mayor McCrory was fully aware of abuse and misconduct by Dobbins, Henderson and the LPD from countless complaints, including complaints made directly to her, as well as complaints at Board meetings and contained in media reports, and through litigation, yet she made no effort to investigate the complaints or take any action to address them.  Instead, she allowed the abuse to continue, resulting in harm to plaintiffs herein.  They allege that, in fact, McCory supported and approved the abusive practices implemented by Dobbins when he became police chief, which practices were continued by his successor, Henderson. They contend that her failure to take action to end these abuses and prevent future violations, including by ensuring proper training officers, amounted to deliberate indifference, and that her deliberate indifference caused their harm.

Although supervisory officials cannot be held liable under § 1983 on a theory of <u>respondeat</u> <u>superior</u>, they may be liable if their own action or inaction, including a failure to properly train or supervise, amounts to deliberate indifference which is the proximate cause of a constitutional violation.  <u>Cantu v. Rocha</u>, 77 F.3d 795, 807 (5th Cir. 1996).  See <u>Estate of Davis ex rel. McCully v. City of North Richland Hills</u>, 406 F.3d 375, 381

(5th Cir. 2005) ("When ... a plaintiff alleges a failure to train or supervise, 'the plaintiff must show that: (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference.'") (quoting Smith v. Brenoettsy, 158 F.3d 908, 911-12 (5th Cir. 1998)).

In the supervisory context, deliberate indifference requires either actual or constructive knowledge of violations. Jenkins v. Rankin Cnty, Ms., Civ. Action No. 3:24-CV-374-DPJ-ASH (S.D. Miss. July 24, 2024) (citing Yara v. Perryton Indep. Sch. Dist., 560 F. App'x 356, 360 (5th Cir. 2014)). As Judge Jordan succinctly explained in Jenkins,

> Constructive knowledge generally requires "a pattern of similar violations." Burge v. St. Tammany Par., 336 F.3d 363, 370 (5th Cir. 2003) (quoting Thompson [v. Upshur Cnty, 245 F.3d 447, 459 (5th Cir. 2001)]. But "[c]onstructive knowledge may be inferred from the widespread extent of the practices, general knowledge of their existence, manifest opportunities and official duty of responsible policymakers to be informed, or combinations of these." Pineda v. City of Houston, 291 F.3d 325, 330 n.15 (5th Cir. 2002) (quoting Spell v. McDaniel, 824 F.2d 1380, 1391 (4th Cir. 1987)). "There must be a 'persistent and widespread practice'" such that a responsible supervisor arguably could not have overlooked it. Id. at 329 (quoting Piotrowski v. City of Houston, 237 F.3d 567, 581 (5th Cir. 2001)).

Id. at *5.

14

In her motion, McCrory argues that plaintiffs' claim against McCrory based on a failure-to-supervise/failure-to-train theory is deficient because (1) plaintiffs have not adequately alleged actual knowledge by McCrory or facts demonstrating a widespread pattern of the types of violations alleged by plaintiffs herein, e.g., false arrest, excessive force; (2) she had no authority to act and thus her failure to act cannot have been the cause of their alleged injuries; and (3) at the least, plaintiffs cannot overcome her qualified immunity.

In the court's opinion, plaintiffs have sufficiently identified a pattern of relevant abusive police practices. Plaintiffs allege that McCrory was aware of abuse and misconduct by Dobbins and Henderson, and by officers under their command, from complaints made by citizens both to her directly and at Board meetings, from reports by police officers and advocacy groups, and from media reports. To be sure, to the extent these allegations do not identify specific incidents in which individuals' constitutional rights are alleged to have been violated, they are conclusory and cannot suffice to demonstrate a pattern. The little detail that is provided is not sufficient, either.

However, on a motion to dismiss, the court can take judicial notice of matters of public record, which includes pleadings filed

15

in state or federal courts.  <u>See</u> <u>Norris v. Hearst Tr.</u>, 500 F.3d 454, 461 n.9 (5th Cir. 2007) ("It is clearly proper in deciding a [Rule] 12(b)(6) motion to take judicial notice of matters of public record").  Several lawsuits have been filed against the City of Lexington, Dobbins, Henderson and LPD officers alleging similar constitutional violations to those alleged herein.  <u>See</u> <u>Harris, et al. v. Dobbins, et al.</u>, Civ. Action No. 3:22-cv-479-TSL-MTP (S.D. Miss.)[8]; <u>Gibson et al v. City of Lexington, Mississippi et al</u>,  3:23-cv-33-TSL-MTP (S.D. Miss.)[9]; <u>Russell v. City of Lexington, et al.</u>, 3:23-cv-500-DPJ-ASH (S.D. Miss.); <u>Jew v. Dobbins, et al.</u>, 3:23-cv-2983-CWR-LGI (S.D. Miss); <u>Young v. Dobbins, et al.</u>, 3:24-cv-752-HTW-LGI (S.D. Miss.).

In addition, a September 26, 2024 report of investigation by the United States Justice Department[10] has found that the LPD

---

[8]    In <u>Harris</u>, the claims of false arrest and excessive force by three of the five <u>Harris</u> plaintiffs were ruled unfounded and dismissed; a fourth was found to be <u>Heck</u> barred; but the claims of one plaintiff survived summary judgment and his false arrest and excessive force claims were ultimately settled.
[9]    The <u>Gibson</u> case, which alleged an egregious incident of excessive force by Henderson and others, was settled and dismissed.
[10]   The complaint references the Justice Department's investigation but not its report, which was not issued until after this case was filed.  The court may take judicial notice of the report.  <u>See</u> <u>Buchicchio v. LeBlanc</u>, No. 23-30116, 2024 WL 4603272, at *4 (5th Cir. Oct. 29, 2024) (finding that district court did not abuse its discretion in taking judicial notice of DOJ report of investigation in evaluating failure-to-train claim).

"consistently violates people's rights during stops, searches, and arrests; and uses excessive force" in that it "aggressively polices low-level violations," "makes stops and arrests [and conducts searches] with no legal justification," "uses excessive force in violation of the Fourth Amendment," and that "LPD officers abuse their authority by sexually harassing women"; that "after arrest, LPD unlawfully keeps people in jail" in that it "unlawfully detains people who owe old fines," "unlawfully sets unaffordable monetary bond without considering arrestees' individual circumstances," "unlawfully jails people without a prompt hearing" and operates an "illegal wealth-based 'cash bond' detention system and coerces guilty pleas in violation of due process."

McCrory argues that even if plaintiffs are found to have adequately asserted a pattern of similar police misconduct, they cannot show that any action or inaction by her caused the alleged constitutional violations because under state law, she had no meaningful authority to address police misconduct.  In particular, she points out that she has no authority to hire or fire, as earlier discussed, and further has no "authority to supervise law enforcement by the police chief or supervise police officers on a daily basis...."  <u>Lee</u>, No. 2002-0749, 2003 WL 356383, *1-2 (Miss.

A.G. Jan. 3, 2003). "The mayor may meet with police officers to obtain information concerning the operation of the police department, but the mayor does not have authority to become involved in the day to day operation of the police department or to make law enforcement decisions." Id. McCrory thus insists that because she has no power over hiring, training or supervision of officers, plaintiffs cannot succeed on their individual capacity claims against her.

Plaintiffs dispute this and argue that as the City's chief executive, Mayor McCrory had the requisite supervisory authority to hold her accountable and liable for her actions or inaction. They point out in their response that under the law, McCrory, as mayor, has the "executive power of the municipality [... and] superintending control of all the officers and affairs of the municipality, and shall take care that the laws and ordinances are executed." Miss. Code Ann. § 21-3-15(1). They submit that it is her legal obligation under Mississippi law to be "active and vigilant in enforcing all laws and ordinances for the government of the municipality, and [to] cause all other officers to be dealt with promptly for any neglect or violation of duty." Miss. Code Ann. § 21-15-9. To fulfill that obligation, they say, she can "require any officer of the municipality ... to make a report to

18

the governing body, in writing, touching any subject or matter [she] may require pertaining to [her] office." Miss. Code Ann. § 21-15-11. And she is further specifically required to "communicate, in writing, to the governing body such information and recommend such measures as in [her] opinion may lead to the improvement of ... the police." Miss. Code Ann. § 21-15-7. She also has the power to suspend any municipal employee with pay as part of her executive enforcement. See Grantham, 1989 WL 451638 (Miss. A.G. Oct. 27, 1989).

The question, "Who are the state actors responsible for [an alleged] constitutional violation?" "'will usually be answered exclusively by reference to state law and practice,'" as "'[t]he states have virtually complete freedom to decide who will be responsible for [given] tasks, and therewith to determine who will be held liable for civil rights violations that occur in the course of carrying them out.'" Doe v. Rains Cnty. Indep. Sch. Dist., 66 F.3d 1402, 1407 (5th Cir. 1995) (quoting Bush v. Viterna, 795 F.2d 1203 (5th Cir. 1986)). See also Garcia v. United States, 62 F.3d 126, 127 (5th Cir. 1995) (en banc) (state law in this context delineates the contours of federal liability by locating the persons who can be held responsible under § 1983 for causing a constitutional injury).

While under Mississippi law, the mayor nominally has control "of all the officers and affairs of the municipality" and the responsibility to see to it that officers are "dealt with promptly for any neglect or violation of duty," her authority to deal with them is strictly limited, in that she may only (1) require them to report to the governing body, i.e., *the Board of Aldermen*; (2) communicate information *to the Board* and make recommendations *for Board action*; and (3) suspend an employee *with pay*, with final review *by the Board*, which can overrule her decision, <u>Gerhart</u>, No. 2002-0056, 2002 WL 1011180, *1 (Miss. A.G. Mar. 8, 2002) (also noting that only the board of aldermen by official action in the minutes may suspend employees without pay).

Although the mayor was not entirely powerless to act in the face of knowledge of LPD misconduct, in the court's opinion, her failure to act could not have caused the constitutional violations alleged by plaintiffs, given the specific ways in which her authority was cabined.  To reiterate, she could only require reports to the Board, or make recommendations to the Board, or suspend without pay subject to review by the Board.11  The Board,

---

11  <u>Cf.</u> <u>Sims v. Adams</u>, 537 F.2d 829 (5th Cir. 1976) (plaintiff stated Section 1983 claim against mayor and police chief for failure to control policeman's known propensity for improper use of force where state law imposed a duty on both to discipline officers).

which was at least as knowledgeable as the mayor about the LPD's abusive practices, had the only meaningful authority to take action to address these practices.  For this reason, the court concludes that the mayor cannot be held personally liable on plaintiff's claim against her for failure to supervise and/or train.  See Gopalam v. City of Gonzales ex rel. Arceneaux, Civ. Action No. 12-542-JJB, 2013 WL 28654, at *4 (M.D. La. Jan. 2, 2013) (although mayor was alleged to have "executive authority over the City of Gonzales and/or the Gonzales City Police Department," she "did not have control and authority over the police officers in question that would give rise to liability.").

Based on the foregoing, it is ordered that McCrory's motion for judgment on the pleadings is granted.

SO ORDERED this 24th day of March, 2025.

/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE